# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**GLENDA LEE RIVERA-CEPEDA**,
Petitioner,

v.

**COMMISSIONER OF SOCIAL SECURITY**,
Defendant.

Civil No. 18-1092 (BJM)

## OPINION AND ORDER

Glenda Lee Rivera-Cepeda ("Rivera") applied for disability insurance benefits on January 6, 2012. She now seeks review of the Commissioner's finding that she is not disabled and thus not entitled to benefits under the Social Security Act ("the Act"). 42 U.S.C. § 423. Dkt. 13. During Rivera's administrative proceedings, a criminal investigation culminated in the guilty pleas of two doctors who treated Rivera. The investigation and subsequent criminal proceedings delayed Rivera's case. She additionally challenges that delay as well as the impact of the doctors' guilty pleas on her individual case. The government opposed the motion. Dkt. 14. The case is before me on consent of the parties. Dkt. 7.

For the following reasons, the Commissioner's decision is **REMANDED** for proceedings consistent with this ruling.

## STANDARD OF REVIEW

The court's review of Social Security disability cases is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987). After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d);

20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity ("RFC") and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured ("DLI"). *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

Rather than requesting review of an initial determination, Rivera here purports to appeal a "redetermination." She specifically invokes the immediacy requirement and the application of "fraud or similar fault" to her case. 42 U.S.C. § 405(u)(1)(A) ("The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits."). For a redetermination to occur, however, there must have been some grant of benefits. Where, as here, there was never a grant of benefits, there cannot be a redetermination of those benefits. Accordingly, Rivera's case will be reviewed

as any denial of benefits would be rather than subject to the statutes governing benefits redetermination.

The crux of Rivera's due process argument, however, applies equally to initial determinations and to redeterminations. "When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this title, the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." 42 U.S.C. § 405(u)(1)(B). The SSA may have reason to believe fraud or similar fault occurred through its own investigations or through referral of an investigation by the Office of Inspector General ("OIG"). *See, e.g.*, 42 U.S.C. § 1320a-8(*l*). "Similar fault" occurs when either "an incorrect or incomplete statement that is material to the determination is knowingly made" or "information that is material to the determination is knowingly concealed." *Id.* at § 405(u)(2).

The Appeals Council, which issues the final administrative determination on social security cases, defines its procedures and guiding principles in the Hearings, Appeals and Litigation Law manual ("HALLEX").[1] HALLEX does not provide substantive rules nor does it interpret statutes as Social Security Rulings do, so it is not entitled to deference. It does, however, illustrate the recommended approach ALJs and the Appeals Council take. HALLEX treats initial claims and redeterminations the same way "in circumstances where an adjudicator has been directed to disregard evidence." HALLEX I-1-3-15(D) (updated June 25, 2014). Pursuant to § 405(u)(2), the adjudicator *must* disregard any information from the OIG referral which resulted in a finding of fraud or similar fault. *See* HALLEX I-1-3-25(C)(4)(a) (updated Feb. 25, 2016). "[A]djudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded when based on an OIG referral of information." *Id.*; *see also* SSR 16-1p, 2016 WL 931538 (March 14, 2016).

---

[1] HALLEX, the Hearings, Appeals and Litigation Law manual, can be located online at https://www.ssa.gov/OP_Home/hallex/hallex.html.

## BACKGROUND

The following is a summary of the case history, treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Rivera was born in 1974. Ex. 3A at 1. She attended school through twelfth grade and then worked as a secretary for the Commonwealth of Puerto Rico. Transcript ("Tr.") 47–48; Ex. 2E at 4. Rivera lost her job on May 31, 2010 as part of a wave of government lay-offs, and she unsuccessfully searched for work in the months after. Tr. 48–49. Rivera received unemployment benefits through the beginning of 2012. *See* Ex. 4D. She filed for disability insurance benefits on January 26, 2012 and cited May 31, 2010 as the alleged onset date. Ex. 2D; Ex A at 2. At that time, Rivera complained of pain in her right knee; back pain, scoliosis, lumbar and cervical problems, and a fracture in the coccyx; diabetes; asthma; and major depression. Ex. 2E at 2. Her disability claim was denied in May 2012. Ex. 3B. She requested reconsideration, and that claim was denied in March 2013. Ex. 7B. Rivera sought a hearing before an ALJ, which was held by videoconference on June 10, 2016.

The long delay between Rivera's reconsideration and hearing may be attributed to an ongoing fraud investigation which involved two doctors from whom Rivera sought treatment. Tr. 19. A memorandum in the case file explains. *See* Ex. 17B at 1–3. Allegations of fraudulent disability insurance claims reached the Social Security Administration ("SSA") in Puerto Rico. The SSA's OIG investigated in early 2012. The investigation resulted in multi-count indictments and subsequent plea agreements for a number of doctors. Dr. Jose Hernandez-Gonzalez, who treated Rivera, pled guilty to participating in a conspiracy to make false statements to the SSA. *Id.*; Tr. 486–493. Dr. Wildo Vargas, a physiatrist who treated Rivera, pled guilty to twice to making a materially false, fictitious, and fraudulent statements and representation to the SSA. Tr. 494–502. Neither plea agreement implicated Rivera. The ALJ excluded the medical reports each provided when reviewing Rivera's evidence and making his determination. Tr. 20.

One of Rivera's primary complaints is knee pain, for which she first saw Dr. Luis A. Rios Reboyras ("Dr. Rios") on April 8, 2011. He ordered an MRI of her right knee and found no meniscal tear, ACL tear, or bone contusion. The MRI did indicate "[s]mall joint fluid accumulation and a small popliteal cyst" and "[m]ild grade 1-2 chondromalacia patella." Ex. 2F

at 1. In April 2012, Dr. Rios performed surgery on Rivera's right knee to fix a meniscal tear. Ex. 8F at 5. Dr. Rios did not prescribe Rivera a cane or recommend she use a walking-aid in his post-operative instructions. Ex. 8F at 9.

Dr. Manuel Badillo Collazo ("Dr. Badillo") referred her for an MRI in February 2013. The imaging showed mild arthritic changes to the right knee, but no fracture. Ex. 12F at 1. By May 2013, a bone scan showed severe inflammatory arthritic changes at the right knee. Ex. 14F at 1. Dr. Badillo prescribed Rivera an ACL brace for her knee, a four-point cane, and a walker. Ex. 15F; Ex. 17F at 4–5. February 2014 scans showed "[m]oderate to severe degenerative changes" in the right knee. Ex. 22F at 1. The ALJ did not acknowledge this cane or walker prescription. Tr. 23.

Rivera also complained of back pain, which allegedly began before her knee pain. When Dr. Melva Gonzalez referred Rivera for an MRI in 2009, the results indicated a "mild disc space narrowing at C5-C6 dis space level." Ex. 3F at 6. Subsequent CT scans in March 2010 revealed normal findings in the pelvis. Ex. 3F at 3–4. Dr. Muriel Gonzalez referred Rivera for another MRI in January 2012. The cervical spine MRI showed narrowing at C5-C6 and at C6-C7. Ex. 5F at 5. She noted that the straightening of cervical and lumbar curvature was probably related to muscle spasms. There is no mention of scoliosis, and the doctor expressly observed a "[n]ormal sacrum and coccyx." *Id.*

Dr. Elia Gonzalez Santiago identified Rivera as having received physical therapy at Loíza Physical Therapy Center since March 2012 for back, neck, and hand pain. Ex. 7F at 2. The April 2012 progress note states that recommended goals were "partially achieved." Rivera displayed "symptoms of CTS B, muscular spasms and PV CDLS and both trapezius." *Id.* A May 2013 scan showed degenerative arthropathy at various locations on Rivera's spine and mild to moderate arthoropathy at shoulders, hips, hands, and other joints. Ex. 14F at 1. Dr. Badillo prescribed Rivera a wrist brace in September. Ex. 15F; Ex. 17F at 4–5, 12. The wrist brace prescription notes a diagnosis of carpal tunnel syndrome, but such a diagnosis does not appear in Dr.

Badillo's notes. Ex. 17F at 14. Also in May 2013, test results were shown to be "compatible with" a lumbar lesion and a right cervical lesion. Ex. 17F at 9–10.

Dr. Miguel Arroyo-Ramos provided physical therapy for Rivera between February 10 and May 12, 2014. Ex. 26F. There are no records of visits between May 2014 and March 1, 2016 except for a single referral of Rivera for a wheelchair in July 2014. Tr. 27 (citing Ex. 29F at 22). Rivera saw Dr. Arroyo-Ramos seven times in March 2016, after the DLI. Ex. 37F. During her first visit, she complained of left shoulder pain suffered from a fall. *Id.* at 2. Three months later, Dr. Arroyo-Ramos wrote a note "to whom it may concern." Ex. 39F at 1. He stated that Rivera needed "all the assistive equipment already prescribed: knee brace, heavy duty wheelchair, walker, wrist brace, and I point cane." *Id.* The ALJ found "no evidential support" for this opinion due to the mentioned lack of records, which contradicts the doctor's own implication of "steady" treatment. Tr. 23. He found it to be a "*post hoc* rationalization" given after the DLI, after the hearing, and after the ALJ "made light of the lack of evidence of an appropriate prescription." *Id.* The ALJ also discounted Dr. Rios's opinion, rendered in 2016, that Rivera used a cane to assist in ambulation because there is no evidence that Rivera saw Dr. Rios after July 2012. Tr. 23 (citing Ex. 41F at 2). Dr. Armando Nazario prescribed Rivera a quad cane in June 2016 the same day Dr. Rios stated that Rivera required a cane to walk, but there is no evidence that Dr. Nazario had treated Rivera before June 2016 or after. Ex. 40F at 2. Both doctors' notes about the cane were created after the DLI.

The SSA deleted a listing related to obesity in 1999 but observed that the effects of obesity on other impairments can constitute a disability. *See* Tr. 22. When Rivera filed her initial claim, she was morbidly obese. Over the course of this proceeding, Rivera worked to change that. Rivera began attending a nutrition clinic in May 2014 after her own efforts to lose weight proved unsuccessful. She attended monthly through October, and each time told the dietician that she felt "well." Ex. 34F at 5, 7, 9. In July 2014 she "[b]egan to walk," and she did some exercises in October; she did not exercise in the other months, but the notes do not explain her noncompliance. *Id.* In November 2014, Rivera's life insurance company authorized her to

undergo gastric bypass surgery. Ex. 31F at 4. She received gastric bypass surgery in June 2015. Ex. 35F at 17–19. Doctors twice observed elevated glucose levels, but the reading taken after her surgery remained within the listed range. Ex. 36F at 3, 10.

Rivera also claimed to suffer from "major deep depression." In the initial disability determination explanation, the SSA interviewer recorded that Rivera had not yet been treated for depression but she had scheduled her first appointment with psychiatrist Dr. Diogenes Adames for June 19, 2012. Ex. 4A at 5. Dr. Adames notes in his first progress report that Rivera was treated by another psychiatrist, but there is no further information listed on the report or in the case file. Ex. 11F at 6. Rivera saw Dr. Adames in June, July, September, October, and November 2012. On each of those visits, Rivera's appearance was normal, her attitude was cooperative, and her affect corresponded to the circumstances. Her thinking was logical, coherent, and relevant, and she was oriented as to time, place, and location. At each visit, her attention and concentration were "altered" and her judgment and introvision [sic] were "poor." She exhibited anxiety at every visit, but Dr. Adames notably did not check the box to indicate sadness at any appointment. Ex. 11F at 7–9.

Dr. Gerardo Tejedor Gonzalez performed a psychiatric examination in March 2013 as part of the reconsideration of Rivera's claim. Ex. 13F. He found her oriented to time, space, and location. Her memory was intact for all events, and she maintained attention and concentration. Dr. Tejedor observed that Rivera had a sad affect and "expressed herself in a complaining manner." Ex. 13F at 5. He observed that she walked with a cane, and she told him she was in pain all over her body. Dr. Tejedor believed Rivera had an anxiety disorder with depressive traits and gave a reserved prognosis. He thought she needed to continue treatment for all her clinical conditions, which included morbid obesity, diabetes, a back condition, right knee issues, asthma, and a coccyx condition. *Id.* at 5–6. Dr. Tejedor assigned Rivera a Global Assessment of Functioning Score (GAF") of "regular to satisfactory," or 51-60. Ex. 13F at 6. On reconsideration, the ALJ weighed Dr. Tejedor's assessment more heavily than that of the SSA consultant who judged Rivera's restrictions to be mild except for a moderate limitation in social

functioning. Ex. 3A at 12. It appears that the consultant received less weight because, contrary to his conclusions, Rivera's function report as well as Dr. Adames and Dr. Tejedor's analyses support a finding of only mild limitation in social functioning. Tr. 24–25.

Dr. Adames saw Rivera again in March 2014, after just under eighteen months without a visit. Dr. Adames noted that Rivera's depression was slight rather than severe because she was taking prescribed medication that had put her symptoms into remission. Ex. 24F; Tr. 29 n.8.

As part of her initial application for benefits, Rivera completed a pain questionnaire in February 2012 and a function report the next month. She identified "strong and constant pain" in her lower back, waist, and right knee in the questionnaire. Ex. 3E at 3. Rivera stated that the pain lasted two to three hours until her medications took effect. She felt pain all day, every day; walking, standing, kneeling, bending or sitting for a long time exacerbated the pain. Pain was worse in the morning and improved or worsened according to her activities and movement in the afternoon. *Id.* At the time, Rivera received physical therapy for her back and hands. She described the pain as limiting her sleep, impeding her ability to perform household tasks, preventing her from driving long distances, and affecting her concentration. *Id.* at 5.

Pain is a common thread in the function report, which contains information about Rivera's typical activities and general abilities. Ex. 4E. Rivera echoed her pain questionnaire when she stated that her pain caused her to get up several times at night to change positions, so she could only sleep one to two hours at a time. Ex. 4E at 10. In the morning, she groomed herself, ate breakfast, and took her medications, though sometimes she needed a reminder. *Id.* at 9, 11. Then, she cleaned the house, did laundry, and took a doctor-recommended ten-minute walk. After, Rivera bathed and lay down to watch television. In the afternoons, she made herself food and watched more television. *Id.* at 9. Rivera cooked two to three times a week for thirty minutes to an hour. Her pain stopped her from cooking every day. *Id.* at 11. Rivera also cleaned, tidied the house, and did laundry. Sometimes her mother helped her with the tasks. Before her impairments, Rivera stated that she worked, helped her husband take care of their home, walked

quickly, exercised, slept well, and used her computer frequently. *Id.* at 10. Pain made it particularly difficult for her to wash her legs and to use her hair dryer. *Id.*

Rivera estimated she left her house three times per week, either driving herself or being driven by another person. She still drove in 2010, but she only took short trips because driving hurt her leg, knee, and lower back. Ex. 4E at 12. Rivera went shopping for groceries, household goods, and clothing. At the grocery store, she went with another person and would try to use the complimentary electric wheelchair. *Id.* Rivera's impairments curtailed her volunteering with the church youth group, but it did not otherwise affect her hobbies, reading the Bible and watching TV daily. She regularly visited church, her mother's home, the supermarket, and the doctor, and she did not need another person to go with her. *Id.* Rivera interacted with other people in person and on the phone and had no problem maintaining good relationships, though pain caused her to commit to fewer social activities. *Id.* at 14, 15. She managed money and paid her bills without needing reminders. *Id.*at 12. But she had great difficulty concentrating and had to write everything down to remember it. *Id.* at 16.

In a survey of her abilities, Rivera checked boxes indicating her condition has affected her ability to: lift, crouch, double over, stand, walk, sit, kneel, climb stairs, remember, finish assignments, concentrate, and use her hands. Ex. 4E at 14. Pain in her hands, back, and legs prevented her from lifting or carrying heavy objects. Rivera needed support to stand up. She could not walk longer than ten minutes at a time and needed five or ten minutes of rest before continuing. She used a knee brace, but she did not mark that she used a cane at that time. *Id.* at 15. Rivera felt afraid of falling down when she walked. She could pay attention well, finish what she started, and follow written instructions but had some trouble with oral instructions. *Id.* at 14.

Because there was a three-year gap between the initial claim and DLI in December 2015, and an additional year before the hearing, the ALJ followed up on some of the information in the function report. Rivera, speaking about December 2015, continued to rate her pain as strong and constant. Tr. 52. She began to use a cane, and her physical impairments remained the same despite gastric bypass surgery leading to significant weight loss. *Id.* at 46–47, 54. Rivera

continued to help around the house with cooking and laundry, shopped with her mother, and paid the bills in person. *Id.* at 55. She said she stopped leaving the house, *id.* at 52, but she still shopped, attended church twice a week, read, watched the news, used her computer, and texted on a smartphone. *Id.* at 58, 59. She got along well with family and friends. *Id.* at 57.

At the hearing, the vocational expert ("VE") classified Rivera's former job as skilled labor and light to medium physical demand as performed. Tr. 61. The ALJ then walked the VE through five scenarios describing a hypothetical individual with some or all of Rivera's claimed impairments and asked whether that individual could perform Rivera's past work or any other job in the national economy. Tr. 62–65. In no instance could the individual perform Rivera's past work, but there were certain unskilled, sedentary occupations that such an individual could perform. *Id.*

The ALJ ultimately found that Rivera was neither disabled within the meaning of the Social Security Act nor unable to perform a job that existed in significant numbers in the national economy. Tr. 22, 31. Accordingly, the ALJ denied Rivera's claim for disability insurance benefits, affirming the SSA finding. Tr. 31. Rivera appealed the finding to the Appeals Council, which denied her request for review. Tr. 1. Rivera then filed the instant request for district court review.

## DISCUSSION

Typically, district courts review ALJ determinations to ensure there is substantial evidence supporting the ALJ's decision. 42 U.S.C. § 405(g). Here, Rivera raises an additional, constitutional question: whether wholesale exclusion of evidence from Drs. Hernandez and Vargas without an individualized finding of fraud or similar fault against Rivera complies with her Fifth Amendment Due Process rights. The court will begin with alleged errors in the determination process in keeping with the constitutional avoidance doctrine. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Should the Commissioner and the ALJ lack substantial evidence supporting their decisions to deny Rivera's claim, then the court need not reach the constitutional question. If, however, there

was substantial evidence supporting the denial of Rivera's benefits, then the court must address the procedure by which the ALJ excluded certain evidence.

### Sufficiency of the Evidence

Pursuant to the Social Security Act, the ALJ must disregard evidence from Dr. Hernandez and from Dr. Wildo Vargas. *See* 42 U.S.C. at § 405(u)(1)(B). The ALJ did so, disregarding Exhibits 5F and 16F. Tr. 20. The ALJ was left with a lengthy record of medical reports, none of which demonstrated a physical impairment that constituted a disability. The absence of severe physical or mental impairments gives strong support for the ALJ's conclusion that Rivera was not disabled between May 31, 2010 and her DLI of December 31, 2015. Multiple inconsistences between the medical reports and Rivera's own testimony further support that conclusion.

Rivera's main complaint was knee pain, but there was no evidence that the impairment was sufficiently severe to qualify as a musculoskeletal disability, even in combination with the effects of her obesity. *See* Tr. 22–23. She did not require a walker, cane, crutch, or wheelchair before her April 2012 knee surgery. In her function report submitted immediately before that surgery, she noted only a knee brace. Ex. 4E at 7. The box for "cane" was left unmarked. *Id.* When additional severe arthritic changes occurred a year later, Dr. Badillo prescribed both a cane and walker. Ex. 17F at 4–6. The ALJ seemingly overlooked the cane and walker prescription, but there is no evidence in the record that Rivera used the walker. While she attended the nutrition clinic, notes remark that she walked for exercise. Ex. 34F at 9. At the hearing, she used a cane and never referred to a walker. Finally, Dr. Arroyo-Ramos mentions only use of a cane during the time he provided physical therapy. Ex. 26F at 5. If there were evidence that Rivera had relied on a walker to ambulate, then she might have qualified for Listing 1.00B2b(1). *See* Tr. 23 n.2; 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B. Because the evidence that she used a walker is scant, and she never disputes that characterization in the ALJ's opinion, the ALJ had sufficient evidence to support his conclusion that she relied only a cane to walk during the six years at issue.

Rivera also claimed disability based on her degenerative cervical disc disease, but her impairment did not cause motor loss or sensory loss, prevent her from walking, as stated above,

or result in severe burning or dysesthesia. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. May 2013 test results were "compatible with" a lumbar lesion and a right cervical lesion, but it does not appear any further testing or treatment was performed. Ex. 17F at 9–10. Neither back pain nor knee pain appear to have affected Rivera's functioning. She continued to attend church twice weekly, go shopping with her mother, do laundry, cook a few times per week, groom and dress herself, and socialize with friends and family. Ex. 4E at 9–12.

The ALJ likewise did not find sufficient evidence to support Rivera's mental impairment. Rivera claimed she suffered from a deep depression, but she made that claim prior to being treated by a psychiatrist or a psychologist. Tr. 24. Neither of the psychiatrists who examined her found her to be suffering from severe depression. In her five visits with Dr. Adames, the only abnormalities he found were poor attention, concentration, and judgment. Though he found her anxious, he did not find her to be sad. Ex. 11F at 7–9. At a follow-up appointment in 2014, Dr. Adames diagnosed her depression as slight, and observed that her prescribed medication had put her symptoms in remission. Ex. 24F. Dr. Tejedor also examined Rivera; while he found she had a sad affect, he diagnosed an anxiety disorder rather than depression. Ex. 13F at 5–6. Dr. Tejedor found Rivera to have a moderate GAF, which aligns with Dr. Adames's observations. The ALJ gave greater weight to these examining doctors rather than the consulting doctor, who still found that Rivera had mild limitations excepting a single moderate one. Ex. 3A at 12.  For depression to qualify as a disability, it must result in at least two marked limitations or extended episodes or decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04; 12.06. Rivera exhibited none of these.

Accordingly, the ALJ's decision to deny Rivera's disability insurance benefits claim was supported by substantial evidence. *See* 42 U.S.C. § 405(g). Because the ALJ properly found her to be not disabled, the court must address Rivera's due process arguments.

### *Due Process*

Rivera objected to the delay in hearing her case as well as to the presumption of fraud applied to her case. The issue of immediacy can be disposed of quickly—Rivera cites a provision

concerning only the speed with which a redetermination must be performed. Dkt. 13 at 2. Section 405(u) requires the Commissioner to "immediately redetermine" benefits in cases where there is reason to believe fraud or similar fault occurred. 42 U.S.C. § 405(u)(1)(A). Rivera's case is not a redetermination, and she does not base her argument on the Administrative Procedure Act, which requires agencies to conclude matters "within a reasonable time." *See* 5 U.S.C. § 555(b); *see also United States v. Zannino*, 895 F.2d 1, 13 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Moreover, her complaint focuses largely on the fact that the delay led to a hearing after her DLI passed. Dkt. 13 at 3. The insurance's expiration did not play a significant role in the SSA's determination that Rivera was not disabled at any point during the insured period, except, as in any case, to serve as a bookend to the body of evidence to be considered. *See* 20 CFR § 404.101(a) (explaining the significance of insured status for granting benefits).

Rivera also argues that the exclusion of evidence from Drs. Hernandez and Vargas without an individualized finding of fraud or similar fault against her violated her Fifth Amendment right to procedural due process. Dkt. 13 at 3–4. Laboring under a misapprehension of the administrative process, however, Rivera devoted her brief to arguing for a waiver of the requirement that a petitioner first exhaust administrative remedies prior to seeking federal court review. Dkt. 13 at 4–10. When the Appeals Council denied Rivera's request for review, Rivera exhausted her final administrative remedy, so there is no need for waiver. *See* Dkt. 14 at 15. As a result, Rivera's due process argument is brief and consists mainly of allusions in her waiver argument. *See* Dkt. 13 at 4–10. The government nonetheless opposed Rivera's due process claims, stating that the Social Security Act does not require an individualized finding of fraud and that, because Rivera was never entitled to benefits, she has a lesser property interest than would have a beneficiary whose benefits are redetermined. Dkt. 13 at 9, 11–12.

If there is reason to believe fraud or similar fault was involved in a beneficiary's claim for disability insurance, the Commissioner must disregard any allegedly tainted evidence. 42

U.S.C. §§ 405(u)(1)(B). The government takes the perspective that because the SSA OIG found reason to believe there was fraud, the Commissioner had no involvement in OIG decision. Dkt. 14 at 9. Therefore, the government contends, Rivera has no right to challenge the determinations of fraud or similar fault before the SSA. *Id*. This misses the point—Rivera does not seek to challenge the proceedings against Dr. Hernandez-Gonzalez or Dr. Vargas but rather the application of their admissions of fraud to her case. The Supreme Court observed that evaluating fault "usually requires an assessment of the recipient's credibility, and written submissions are a particularly inappropriate way to distinguish a genuine hard luck story from a fabricated tall tale." *Califano v. Yamasaki*, 442 U.S. 682, 697 (1979). The *Califano* court, ruling on termination of welfare benefits, did not see how the pertinent circumstances on which finding fault relies, including a beneficiary's physical condition, mental condition, and good faith, "can be evaluated absent personal contact between the recipient and the person who decides his case." *Id.* A one-sided credibility determination judges and, in some cases, punishes a person on papers over which she lacked control rather than by her acts or intent, which are more traditional metrics in our legal system. Adherence to procedure in this case leads to the same consequence: the SSA attributes claimants unknowing or innocent of fraudulent, third-party conduct with that criminal act without an opportunity to challenge that determination. *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 803 (6th Cir. 2018).

Procedural due process varies according to the context, and the Supreme Court established a balancing test to measure the required level of due process in *Mathews v. Eldridge*, 424 U.S. 319 (1976). To evaluate the procedural safeguards the Constitution requires in a given scenario, a court must weigh three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

Federal courts around the country have recently faced questions identical to Rivera's, albeit in the context of benefits redeterminations. The Sixth Circuit recently found procedural due process violations in eleven consolidated redetermination cases. *Hicks*, 909 F.3d at 797–804. A vigorous dissent, however, reflects both the SSA's position, *see* Dkt. 22, and the position of some district courts in the Fourth and Eleventh Circuits. *See, e.g., Robertson v. Berryhill*, Civil No. 16-3846, 2017 WL 1170873 (S.D. W. Va. March 28, 2017); *Roberts v. Commissioner*, Civil No. 17-565, 2017 WL 5712895 (M.D. Fla. Oct. 27, 2017). Judges decided those cases prior to *Hicks*, many favorably citing cases which *Hicks* overturns. Other district courts in the Fourth and Seventh Circuits, writing after *Hicks*, found the Sixth Circuit opinion persuasive and reached the same conclusion. *Tyler J. v. Saul*, Civil No. 17-50090, 2019 WL 3716817, at *4–8 (N.D. Ill. Aug. 7, 2019); *Kirk v. Berryhill*, Civil No. 17-2189, 2019 WL 2950022, at *7–8 (D.S.C. July 9, 2019). The First Circuit faced a question similar to Rivera's but resolved the matter on threshold procedural grounds before it could reach the due process issue. *Justiniano v. SSA*, 876 F.3d 14, 27–28 (1st Cir. 2017). The First Circuit favorably cited a lower court case affirmed in *Hicks* when it observed that the plaintiffs in *Justiniano* showed "at least a colorable claim of ultimate success on the merits." *Id.* at 28 (citing *Hicks v. Colvin*, 214 F. Supp. 3d 627, 633–46 (E.D. Ky. 2016) *aff'd sub nom Hicks v. Commissioner*, 909 F.3d 786).

The courts in *Hicks*, *Kirk*, *Roberts*, and *Robertson* each applied the *Mathews* balancing test to review Social Security disability insurance redeterminations challenged by the plaintiff. [2] Notably, each of those redeterminations involved attorney Eric Conn and ALJ David B. Daugherty, both of whom pleaded guilty to a scheme to defraud the SSA through falsified medical documents in disability insurance claims. *Hicks*, 909 F.3d at 791–92, 797–805 (finding

---

[2] While these cases each applied *Mathews*, it bears noting that the Sixth Circuit in *Hicks* also applied a minimum due process analysis. *Hicks*, 909 F.3d at 797. The court explained its decision as reflecting that procedural due process in the redetermination context required, "at a minimum, 'a fair opportunity to rebut the Government's factual assertions'" whereas *Mathews* better applies to cases determining whether additional process is due. *Id. Hicks* ultimately found that petitioners prevailed under the minimum due process test as well as under *Mathews*. *Id.* I apply *Mathews* as the stricter of the two tests and because both parties considered it the appropriate method.

due process violations); *Kirk*, 2019 WL 2950022, at *2 (finding due process violations); *Robertson*, 2017 WL 1170873, at *1, *5–10 (finding no due process violations); *Roberts*, 2017 WL 5712895, at *1 (finding no due process violations). *Hicks* found due process violations in the restrictions placed on ALJ discretion, which varied solely based on which office referred the cases for redetermination. *Hicks*, 909 F.3d at 801–04.

As a threshold matter, *Mathews* balances interests to determine the due process merited. The District of Massachusetts found that a disability insurance applicant had a legitimate claim to entitlement because he qualified for Social Security after paying money into the system "for the requisite number of quarters." *Butland v. Bowen*, 673 F. Supp. 638, 641 (D. Mass. 1987). The same court observed that the Supreme Court had not yet ruled on the extent of that claim or interest, which remains true. *Id.* at 640–41. The government concedes the property interest and argues its lesser nature. Dkt. 14 at 11 (citing *Kapps v. Wing*, 404 F.3d 105, 115-16 (2d Cir. 2005) (granting applicants a limited property interest in process "sufficient to permit a demonstration of eligibility"); *Raper v. Lucey*, 488 F.2d 748, 752 (1st Cir. 1973) (providing due process to a driver's license applicant)). As an insurance applicant rather than a beneficiary, Rivera enjoys a lesser property interest than the plaintiffs in *Hicks*, but neither Rivera nor the First Circuit explains how much less.

To approach the same question from another angle may prove instructive. The First Circuit has observed, in an unpublished case concerning the re-opening of a denied application for social security disability insurance benefits, that "[p]rocedural due process in the social security context requires no more than an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Gilbert v. Sullivan*, 48 F.3d 1211, 1995 WL 91120, at *1 n.3 (1st Cir. 1995) (quoting *Mathews*, 424 U.S. at 333). In the absence of a more recent standard and in light of the government concession that Rivera indeed has a property interest in Social Security disability insurance, the court will follow *Gilbert* and determine whether Rivera received the minimum: a "meaningful" opportunity to be heard.

Turning to the first *Mathews* factor, Rivera's private interests are clear. Like the plaintiff in *Butland*, she paid into Social Security. *Butland*, 673 F. Supp. at 641. Rivera asserts that she is disabled and cannot work, so she needs social security disability insurance in order to pay for her expenses. *See id.* In addition, the exclusion of medical reports due to fraud or similar fault associates Rivera with a criminal act. *See Hicks*, 909 F.3d at 803. Rivera has been unable to challenge the government's declaration that there is "reason to believe" her medical reports were exaggerated and falsified by Dr. Hernandez-Gonzalez and Dr. Vargas. Evaluating fault "usually requires an assessment of the recipient's credibility, and written submissions are a particularly inappropriate way to distinguish a genuine hard luck story from a fabricated tall tale." *Califano*, 442 U.S. at 697. Here, the government denied Rivera that neutral assessment and presumed her reports were fraudulent.

As to the second *Mathews* factor, the SSA claims that sufficient safeguards protect due process. Rivera took advantage of one such safeguard, submitting additional evidence. Dkt. 14 at 12 (citing Tr. 1057-64). The SSA also cites impartial hearings before an ALJ where Rivera can directly challenge the information in her file and the correctness of the SSA's conclusion. Dkt. 12. This particular safeguard is disingenuous—Rivera, as the government stated pages earlier in its brief, cannot directly challenge the inclusion of the fraud investigation and the application of Dr. Hernandez-Gonzalez and Dr. Vargas's guilty pleas to her case because "'the Commissioner had no involvement in' these independent proceedings." Dkt. 14 at 11 (quoting *Robertson*, 2017 WL 1170873, at *13). The hearing is restricted to the accuracy of the admissible medical records and the SSA's conclusions. Dkt. 14 at 12. By washing its hands of the independent OIG investigations, the SSA is trying to get the best of both worlds. It pays lip service to the hearing as a safeguard, but the hearing denied Rivera the opportunity to make a meaningful, direct challenge to the similar fault or fraud finding. From the SSA's perspective, however, Rivera's inability to challenge the plea agreements does not compromise her right to entitlements because the final decision rests on all the evidence rather than on the agreements. Dkt. 14 at 12. It follows, the government argues, that the ability to challenge the plea agreement would not be an

inadequate safeguard. This ignores the problem. Rivera does not wish to challenge independent plea agreements—she wishes to challenge their application to her case because the consequent exclusion of records from the doctors who plead guilty affects the total evidence the ALJ may consider.

These additional safeguards simply do not address the greatest risk of eliminating ALJ discretion: exclusion of suspect medical evidence. *See Hicks*, 909 F.3d at 801; *Robertson*, 2017 WL 1170873, at *7. Supreme Court precedent indicates that the risk of erroneous deprivation is "unacceptably high" when the plaintiff is denied notice of the SSA's factual assertions and "a fair opportunity to rebut those assertions before a neutral decisionmaker." *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004). The government rejects Rivera's request to challenge those findings, placing the OIG report on a pedestal. Exclusion presents a multifaceted due process problem. Plaintiffs do not receive notice of the factual determinations detailing the reason to believe fraud or similar fault was involved in their application, and large amounts of evidence may be excluded when only small portions, if any, likely qualify for exclusion.

As the Sixth Circuit found in *Hicks*, I conclude that "the risk of an erroneous deprivation under the SSA's current framework is too high." *Hicks*, 909 F.3d at 800. The opportunity to attack the ALJ's finding is not equivalent to the ability to attack the determination that similar fault or fraud was involved in an application and explicit instructions to disregard evidence. Because plaintiffs lack access to the factual determinations, they cannot challenge the amount or type of evidence disregarded. Nor can ALJs, because OIG investigation findings are rendered conclusive by law. *See* 42 U.S.C. § 405(u)(2). This would resolve the issue spotted in *Hicks*, where the OIG knew that only a small portion of each physician's report was fraudulently prepared, but the SSA ordered ALJs to disregard any evidence signed by those physicians, including materials for which there was no claimed reason to believe fraud or similar fault was involved. *Hicks*, 909 F.3d at 801. This tangle of deference to the OIG findings heightens the risk of erroneous deprivation to an untenable level. The impartial ALJ and the existence of a hearing at which the plaintiff may testify could be powerful safeguards, but when the ALJ lacks

discretion and the evidence presented and heard comes pre-censored, a high risk of deprivation remains. Moreover, a grant of discretion to ALJs reviewing redeterminations based on OIG investigations should not be burdensome because they already apply discretion in the case of SSA investigations. *See* HALLEX I-1-3-25(C)(4)(a); SSR 16-1p, 2016 WL 931538; *Hicks*, 909 F.3d at 801–04 (holding that distinct treatment of evidence based solely on the source of referral for redetermination violates the Due Process Clause of the Fifth Amendment).

The government notes the burdens it faces in the final *Mathews* factor. The government places high value on maintaining efficiencies in cost and time. Moreover, the SSA asserts "requiring specific findings in every case would thwart independent authorities (such as the DOJ or OIG) of their authority to identify and prosecute program fraud and render findings that can themselves serve as the basis for the disregarding of evidence." Dkt. 14 at 13. This warning, however, disregards what the SSA claims just two pages prior: an ALJ would have given the reports little weight in light of their authors' fraud admissions. *Id*. If the SSA concedes that the ALJ is able to exercise discretion in this manner and "carefully cull[] other evidence of record" that may be considered, then protecting the exclusionary effects of the OIG finding seems superfluous.

The government warns that individualized findings of fault would cause substantial delay and could interfere with trials of defendants in a criminal case. Dkt. 14 at 14. The *Robertson* court called this delay "[t]he greatest detriment to the SSA" in requiring such hearings. *Robertson*, 2017 WL 1170873, at *10. Hearings could increase the cost of the determination process. The Sixth Circuit observed that requiring ALJs to review the sufficiency and merits of the OIG investigations would be a great burden in addition to potentially infringing on law enforcement efforts, and the SSA makes the same argument here. *See Hicks*, 909 F.3d at 803; Dkt. 22 at 20. It is unclear, however, why an ALJ would be unable to review OIG evidence in addition to the complex and lengthy records they already endure. The government even praised the ALJ's ability to do so as a safeguard before. Dkt. 14 at 13. The burden additional records create is more likely borne by OIG investigators, who would have to be more detailed in

explaining why there is "reason to believe fraud or similar fault" was involved in any individual beneficiary's application in order for ALJs to have sufficient information to review those findings. Such review would not so much infringe on law enforcement investigations as demand a level of detail and proof from investigators commensurate with the consequences of their findings. Furthermore, the SSA already offers that level of proof because its investigators are not afforded the same level of deference as OIG's. If the SSA can rise to meet a burden of thoroughness and factual support, so must the OIG.

## CONCLUSION

On balance, the *Mathews* factors favor Rivera. *Mathews*, in its discussion of due process for a plaintiff, emphasizes opportunities: the "opportunity to meet [the case against him]," "a meaningful opportunity to present their case," and "an effective process for asserting his claim." *Mathews*, 424 U.S. at 349. Rivera was denied that meaningful, effective opportunity. The administrative burden on the SSA cannot stand up to the risks of erroneous deprivation. Without review or the opportunity to challenge the finding of fraud or similar fault, the statute breaks with *Mathews*. It denies plaintiffs, whether or not they are beneficiaries, an adequate opportunity to challenge the OIG investigation and the application of those investigations' findings to their individual medical records. Where the government seriously injures an individual based on its factual findings, the individual must be given both access to those facts and the opportunity to prove them untrue. *Greene v. McElroy*, 360 U.S. 474, 496 (1959). The Supreme Court calls this opportunity "immutable in our jurisprudence." *Id.*

Among those afforded the opportunity to challenge the facts against them before a neutral arbiter are: suspected Al Qaeda operatives, employees fired for lying on employment forms, and persons subject to a seizure of goods pursuant to a writ of replevin. *Hicks v. Colvin*, 214 F. Supp. 3d 627, 630 (E.D. Ky. 2016). The OIG finding, in contrast, is treated as determinative; there is no provision for claimants to prove that, in their case, reports were neither exaggerated nor fraudulent. In effect, the SSA has trapped them in a labyrinth of deference and denied discretion, with their entitlements hidden somewhere in its depths. Such manipulation of process violates

the Due Process Clause of the Fifth Amendment and warrants remand for proceedings consistent with this opinion.

**ORDER**

The Due Process clause requires the government to treat plaintiffs equally, regardless of which organization referred their claim for redetermination.

The Commissioner's decision denying Plaintiff's disability claims is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 5th day of September, 2019.


*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge